FILED

2026 Jun-23  PM 02:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

**KYU BONG CHOI,**
    Plaintiff,

**v.**

**HORIZON FREIGHT
SYSTEM INC.,** *et al.*,
    Defendants.

**Case No. 4:23-cv-1692-CLM**

## MEMORANDUM OPINION

Plaintiff Kyu Bong Choi was driving a tractor-trailer truck eastbound on Interstate-20 on November 15, 2021, when he collided with another truck driven by Defendant Anthony Dyches. Choi alleges that Dyches caused the accident by swerving into his lane, and that he sustained substantial injuries. So Choi sues Dyches and Dyches' alleged employers, Defendants Horizon Freight System, Inc. ("Horizon Freight") and Horizon Mid Atlantic, Inc. ("Horizon Mid Atlantic") (collectively "Defendants"), for Negligence (Count I); Wantonness and Recklessness (Count II); and Negligent Entrustment (Count III) against the Defendant Companies. (Doc. 1-1, pp. 8-16). Choi seeks both compensatory and punitive damages for Defendants' alleged misconduct.

All Defendants move for summary judgment on Counts II and III and on Choi's claims for punitive damages. Defendant Horizon Freight also seeks summary judgment as to Choi's negligence claim (Count I). For the reasons explained below, the court will **GRANT IN PART** and **DENY IN PART** Defendants' motion for summary judgment. (Doc. 85).

## BACKGROUND

Below the court details the facts; some are genuinely disputed and some are not. When needed, the court explains the difference and presents the genuinely disputed facts in the light most favorable to Choi because he is the non-moving party.

———

This case stems from a collision that occurred on November 15, 2021, at around 8:00 p.m. on I-20 east in St. Clair County, Alabama. (Doc. 86-1, p. at 64). That day, Anthony Dyches, an independent contractor of Horizon Mid Atlantic, was operating a tractor truck which Dyches owned and leased to Horizon Mid-Atlantic. (Doc. 86-15, pp. 339-352). Dyches was traveling east from Alabama to Charleston, South Carolina to pick up a load to transport for Horizon Mid-Atlantic. (Doc. 86-2, p. 58).

Choi was on I-20 east at the same time, operating a tractor trailer truck owned by CST Liners, Inc., transporting a load to Charlotte, North Carolina. (Docs. 86-1, p. 65; 86-3). I-20 has three lanes of travel in each direction. (Doc. 86-2, p. 66-67). Dyches was traveling east in the middle lane, while Choi was traveling east in the right lane. (*Id.*) Choi and Dyches drove beside each other for several minutes leading up to the collision. (*Id.*) What happened next is disputed.

Dyches says that as he drove down I-20 a third tractor trailer truck was driving closely behind him, and that Choi and the third truck were "going at it" fighting over the lane. (Doc. 86-2, pp. 70, 72). Dyches tapped on his brakes and activated his right turn signal to try to let the third truck get around him. (Doc. 86-2, p. 82). Dyches could see that Choi's front bumper was about in line with Dyches' rear tire and admitted that the two trucks were "too close for [him] to get over." (Doc. 86-2, p. 82).

Then, according to Dyches, the third truck drove into the left lane to get around him, and in the process of doing so, swerved and "tried to hit" Dyches' tractor. (Doc. 86-2, p. 86). So, to avoid being hit by the third truck driver, Dyches overcorrected to the right and swerved into Choi's

2

line of travel in the right lane. (Doc. 86-2, pp. 87-91). Because of the overcorrection, Dyches' vehicle collided with Choi's, resulting in both vehicles running off the right side of I-20 and colliding with a ditch. (*Id.*)

As Dyches tells it, the erratic driving of the third truck caused his overcorrection and collision with Choi's vehicle. But all eyewitnesses present at the scene of the accident tell a different story.

Shariya Curry and Jaylah King were also on I-20 east on the night of the accident. (Doc. 86-5, p. 19). King was driving and Curry was in the passenger seat as they rode behind Choi and Dyches for several minutes. (*Id.*) King kept her distance from the tractor trailers because she observed that Dyches was driving his truck "too close" to Choi's. (Doc. 86-4, p. 37). King was not sure whether the trucks were "tussling over a lane" or whether "someone was asleep," (*id.*), but she could "sense that a collision was going to happen." (Doc. 86-4, p. 28).

In her deposition, King's testimony was clear that Choi stayed within his lane, and that she never saw him do anything that would have contributed to the accident. (Doc. 86-4, p. 27). Instead, King saw Dyches drift into Choi's lane causing the vehicles to collide and crash into the ditch. (Doc. 86-4, p. 40). As for the presence of a third truck, King testified that she did not see another tractor trailer near Choi or Dyches' trucks, and that there was no third truck that was in any way involved in the collision. (Doc. 86-4, pp. 23-24). King testified that she only saw the third tractor trailer after the wreck when a driver pulled over to ask if Choi and Dyches were okay. (Doc. 86-4, p. 24).

Curry's testimony lines up with King's. Curry also said that she did not observe Choi doing anything that she believed caused or contributed to the accident. (Doc. 86-5, p. 20). Rather, Curry stated that Dyches was "going a little bit faster than … he was supposed to," (doc. 86-5, p. 22), guessing that Dyches was driving anywhere between 85 and 90 miles per hour, (doc. 86-5, p. 32). Curry was similarly clear that the third tractor trailer had nothing to do with the cause of the accident. (Doc. 86-5, p. 23). In fact, Curry stated that the third truck was behind Dyches and Choi at

all times leading up to the accident and only went around them to pull over and assist the drivers after the collision. (Doc. 86-5, pp. 46-47).

Curry and King's deposition testimony is consistent with the statements they gave Alabama State Trooper Jordan Dill at the scene of the accident. (*See* docs. 86-3, p. 3; 90-1, pp. 23-24). When he arrived shortly after the collision, Trooper Dill took statements from Choi, Dyches, King, and Curry. During his deposition, Trooper Dill explained that when Curry and King gave their witness statements at the scene, "[t]hey stated that there was no other vehicle involved or no other vehicle that contributed to the accident." (Doc. 90-1, pp. 23-24).

If the witnesses had seen Choi and Dyches "tussling over a lane," Dill would have annotated it in his report. (Doc. 90-1, p. 31). But Curry and King said "[n]othing remotely close" to that effect. (*Id.*) Dill similarly would have included in his report if another vehicle was considered a possible cause of the accident and "would have done every effort … to find that other vehicle." (*Id.*) But he didn't.

## STANDARD OF REVIEW

In reviewing a motion for summary judgment, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. *See Cuesta v. Sch. Bd. of Miami-Dade Cty.*, 285 F.3d 962, 966 (11th Cir. 2002). Summary judgment is appropriate when there is no genuine dispute of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party asking for summary judgment always bears the initial responsibility of telling the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, Rule 56 requires the

nonmoving party to go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The court has "wide discretion" to take judicial notice of appropriate adjudicative facts at any stage in a proceeding. *Lodge v. Kondaur Cap. Corp.*, 750 F.3d 1263, 1273 (11th Cir. 2014). The court may take judicial notice of a fact "not subject to reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed R. Evid. 201(b). "Courts may take judicial notice of 'relevant public documents required to be filed' that are 'not subject to reasonable dispute.'" *Watts v. Joggers Run Prop. Owners Ass'n, Inc.*, 133 F.4th 1032, 1036 n.3 (11th Cir. 2025) (*quoting Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999)). Further, the court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2).

Choi requests that the court take judicial notice of three documents: (1) the U.S. Department of Transportation Federal Motor Carrier Safety Administration ("FMCSA") Licensing and Insurance Public Details for Horizon Freight Systems, (doc. 89-5); (2) the FMCSA Licensing and Insurance Public Details for Horizon Mid Atlantic, Inc., (doc. 89-6); and (3) the Ohio Secretary of State's Business Details for Horizon Mid Atlantic, Inc., (doc. 89-7). (*See* doc. 92). The court finds that these documents are not subject to reasonable dispute, and their contents can be accurately determined from public records available from the U.S. Department of Transportation and the Ohio Secretary of State, sources whose accuracy cannot reasonably be questioned. Fed R. Evid. 201(b); *see also Watts*, 133 F.4th at 1036 n.3. Because Choi requests that the court take judicial notice and has supplied the necessary information, the court "must take judicial notice" of these documents. Fed. R. Evid. 201(c)(2).

## DISCUSSION

All Defendants move for summary judgment on Choi's negligent entrust claim, wantonness claim, and claim for punitive damages. Horizon Freight moves for summary judgment on all Choi's claims against it, including negligence. So the court begins its discussion by deciding whether Horizon Freight will remain a Defendant in this case at all. After determining to whom the remaining claims apply, the court will move to Choi's negligent entrustment claim. The court will then address Choi's wantonness claim, which in turn will inform whether Choi can maintain his claim for punitive damages.

## I.     Vicarious Liability and the Horizon Defendants

Generally, Choi argues that the Horizon Defendants are vicariously liable for Dyches' conduct because they are his employers. But Defendants disagree. Horizon Freight argues that it has no connection to Dyches or the underlying accident, so it cannot be liable for any of Choi's claims arising from the accident with Dyches. According to Horizon Freight, it was "not the motor carrier, did not contract with Dyches, did not own or lease the subject tractor trailer, and played no role in the events giving rise to Plaintiff's claims." (Doc. 87, p. 24). Horizon Freight instead points the finger at Horizon Mid Atlantic because it contracted with Dyches and leased his truck. The record, however, is not as clear cut as Horizon Freight makes it out to be.

Choi, on the other hand, says that both Horizon Defendants employed Dyches. (*See* doc. 91, p. 22). And, as you will see, Choi presents substantial evidence to back up that claim. Whether the Horizon Defendants can be held liable for Dyches' conduct comes down to the scope of vicarious liability of a lessee under a federally regulated carrier lease. The parties' briefings on Horizon Freight's liability do not squarely address the historic developments or trends in this evolving area of the law. Nevertheless, the court discusses the issue below.

6

A.   Federal "Statutory Employee" Liability

For more than 50 years, lease agreements between truck owners and interstate motor carriers have been governed by extensive and evolving federal regulations. In the mid-1950s, Congress recognized the increasing prevalence of arrangements in which motor carriers, rather than owning fleets and employing drivers directly, contracted with independent owner-operators while retaining substantial control over the equipment and operations. By calling the drivers "independent contractors," the motor carriers sought to escape liability for incidents arising from the drivers' negligence.

In 1956 Congress amended the Interstate Common Carrier Act to address abuses arising from these "often fly-by-night arrangements," which had resulted in "a helter-skelter operation of thousands of unregulated vehicles on the highways as a menace to safety." *Simmons v. King*, 478 F.2d 857, 866–67 (5th Cir. 1973).[1] The purpose of the amendment was to "protect the public from the tortious conduct of the often judgment-proof truck lessor operators by requiring interstate motor carriers to assume full direction and control of the vehicles as if they were the owners of such vehicles." *Edwards v. McElliotts Trucking, LLC*, 268 F. Supp. 3d 867, 877 (S.D.W. Va. 2017) (citations omitted). Congress codified this purpose in 49 U.S.C. § 14102, which states:

> **49 U.S.C § 14102 - Leased motor vehicles**
>
> (a) General authority of Secretary—The Secretary may require a motor carrier … that uses motor vehicles not owned by it to transport property under an arrangement with another party to—

---

[1] The Eleventh Circuit has adopted as precedent all decisions of the former Fifth Circuit Court of Appeals rendered before October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

7

(1) make the arrangement in writing signed by the parties specifying its duration and the compensation to be paid by the motor carrier;

(2) carry a copy of the arrangement in each motor vehicle to which it applies during the period the arrangement is in effect;

(3) inspect the motor vehicles and obtain liability and cargo insurance on them; and

(4) have control of and be responsible for operating those motor vehicles in compliance with requirements prescribed by the Secretary on safety of operations and equipment, and with other applicable law as if the motor vehicles were owned by the motor carrier.

49 U.S.C § 14102.

The legislation also authorized the Interstate Commerce Commission ("ICC") to regulate the leasing of trucking equipment. Taking direction from 49 U.S.C § 14102, the ICC promulgated regulations governing lease arrangements.[2] The most relevant of these regulations, sometimes referred to as the "control regulation," reads as follows:

**49 CFR § 376.12 - Lease requirements.**

(c) Exclusive possession and responsibilities.

(1) The lease shall provide that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease. The lease shall further provide that the authorized carrier lessee shall

---

[2] The ICC was abolished in 1996, and 49 U.S.C. § 11107 was reenacted substantially unchanged as 49 U.S.C. § 14102, referring to the Secretary of Transportation instead of the ICC.

8

> assume complete responsibility for the operation of the equipment for the duration of the lease.

49 CFR § 376.12(c)(1).

Before 1992, a majority of courts interpreted § 376.12(c)(1) to create an irrebuttable "statutory employment" relationship between carriers and owner-operator lessors that was independent of any state common law definition. *See, e.g.*, *Price v. Westmoreland*, 727 F.2d 494, 495 (5th Cir. 1984); *Rodriguez v. Ager*, 705 F.2d 1229, 1237 (10th Cir. 1983). In other words, even if there was not a clear agency relationship between the carrier and the driver under the applicable state law, the federal-lease regulations established such a relationship. *See Simmons*, 478 F.2d at 867. So, "whether the drivers are called direct employees, independent contractors, or owner-operators[,] if the carrier hires them to transport a shipment, they are the carrier's statutory employees and the carrier has statutory control over the equipment and the driver to support vicarious liability." *Puga v. About Tyme Transp., Inc.*, 227 F. Supp. 3d 760, 763 (S.D. Tex. 2017).

The former Fifth Circuit, and other courts, also found that the statutory relationship created by § 376.12(c)(1) was not always limited to a driver and a single motor carrier. *See Simmons*, 478 F.2d at 867 (holding that the statutory liability of one carrier lessee does not preclude joint and several liability of another carrier lessee based on a common law theory). "[U]nder certain conditions it is clear that more than one common carrier *can* share ownership and control of leased vehicles." *Zamalloa v. Hart*, 31 F.3d 911, 914-15 (9th Cir. 1994). In some cases, two common carriers may share ownership and control such that it "implies a consequent sharing of responsibility." *Zamalloa*, 31 F.3d at 915; *see also Simmons*, 478 F.2d at 867.

"Beginning in the late 1980's, however, and at the behest of petitions by industry trade groups, the ICC began issuing guidance documents that seriously questioned the prevailing judicial interpretation of its regulations." *Edwards*, 268 F. Supp. 3d at 878 (*citing* Lease &

Interchange of Vehicles (Identification Devices) (49 C.F.R. Part 1057), 3 I.C.C.2d 92, 93 (1986)). "The [ICC] emphasized that the nature of vicarious liability under a regulated lease is a matter of *state*, not federal, law ...." *Lohr v. Zehner*, No. 2:12-cv-533, 2014 WL 2504574, at \*3 (M.D. Ala. Jun. 3, 2014).

In 1992, the ICC formally amended §376.12(c) by adding Subsection (4), to clarify that:

> (4) Nothing in the provisions required by paragraph (c)(1) of this section is intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier lessee. An independent contractor relationship may exist when a carrier lessee complies with 49 U.S.C. 14102 and attendant administrative requirements.

49 CFR § 376.12(c)(4).

"Despite the amendment's apparent clarity, there is no consensus among federal courts of the amendment's effect on the relationship between carriers and owner-operator lessors." *Edwards*, 268 F. Supp. 3d at 878. As other district courts examining the issue have observed, three approaches have surfaced in the intervening years. First, some courts have clung to the pre–1992 interpretation of the control regulation, applying an irrebuttable presumption of liability on the motor carrier. *See e.g.*, *Zamalloa,* 31 F.3d at 917. An emerging second group places a greater emphasis on the amended regulation, specifically subsection (c)(4), holding that courts must look to state law to classify the relationship between carriers and owner-operators. *See, e.g.*, *Lohr*, 2014 WL 2504574, at \*2–3; *Jett v. Van Eerden Trucking Co., Inc.*, No. 10-cv-1073, 2012 WL 37504, at \*4 (W.D. Okla. Jan. 9, 2012). And a third group of courts has taken an approach that splits the difference. Those courts read § 376.12(c)(1) and (c)(4) together to create a rebuttable presumption of employment that can be rebutted by resort to state common law principles. *See e.g.*, *Edwards*, 268 F. Supp. 3d at 878; *Delaney v. Rapid*

*Response, Inc.*, 81 F. Supp. 3d 769, 779 (D.S.D. 2015); *Thomas v. Johnson Agri–Trucking*, 802 F. Supp. 2d 1242, 1249 (D. Kan. 2011); *Bays v. Summitt Trucking, LLC*, 691 F. Supp. 2d 725, 730-31 (W.D. Ky. 2010).

The Eleventh Circuit has said little about the interpretation of motor carrier liability. The only case in which the Eleventh Circuit has done so arose in the workers' compensation context before the 1992 amendment. *See Judy v. Tri-State Motor Transit Co.*, 844 F.2d 1496 (11th Cir. 1988). Still, that case, as well as surviving precedent from the former Fifth Circuit, are instructive as to how the regulations should be interpreted as amended. Adding circuit precedent/instruction to the general interpretative canon that a statute or regulation "should be construed so that effect is given to all its provisions," *Corley v. United States*, 556 U.S. 303, 314 (2009), this court will apply the "rebuttable presumption" approach to motor carrier liability.

Let's start with the canon that gives effect to all provisions. As my colleague in the Southern District of West Virginia explained:

> The 'rebuttable presumption' standard avoids the fundamental problem with each of the other two interpretations—disregard of either Subsection (c)(1) or (c)(4). Courts that have continued to hold that the control regulation creates an irrebuttable employment relationship read Subsection (c)(4) out of the ICC regulations and ignore the ICC's plainly stated intent in its guidance documents. …
>
> Courts that have held that the control regulation, and thereby Section 14102, has no impact on the relationship between carriers and owner-operators wish away Subsection (c)(1). Subsection (c)(1), however, quite clearly carries out the Congressional mandate found in Section 14102 that compelled the ICC to promulgate leasing regulations requiring carriers to exert control over leased trucks "as if the motor vehicles were owned by the motor carrier." 49 U.S.C. § 14102.

11

*Edwards*, 268 F. Supp. 3d at 879. Applying a rebuttable presumption of employment between the carrier and operator gives effect to subsection (c)(1), and the plain language and stated purpose of 49 U.S.C. § 14102. It does so without "over-correct[ing] the problem Congress sought to address." *Bay,* 691 F. Supp. 2d at 731. And under this approach, subsection (c)(4) and the ICC's guidance are not left out in the cold because the presumption can be overcome by state common law norms. In sum, the rebuttable presumption approach "respects both the ICC's desire to base the ultimate classification of the carrier-owner-operator relationship on state common law and Congress' intent to 'thwart abuses by carriers who would lease equipment from independent contractors who are not ... regulated.'" *Edwards*, 268 F. Supp. 3d at 878-79 (citation modified).

Now for precedent. In *White v. Excalibur Ins. Co.*, the former Fifth Circuit examined 49 U.S.C. § 14102 in the workers' compensation context. 599 F.2d 50, 53 (5th Cir. 1979). Even before the 1992 regulatory amendments came into play, the former Fifth Circuit observed: "To make [interstate carriers] assume the burden of liability for the harm caused by their leased vehicles without according them the protection given employers under state substantive law would broaden their exposure to suit beyond that to which employers in fact are subject. We find no warrant for such strict liability in the federal law." *White*, 599 F.2d at 53.

Nearly a decade after *White*, the Eleventh Circuit took up a motor carrier liability case, also in the workers' compensation context. *See Judy*, 844 F.2d 1496. In *Judy*, the Eleventh Circuit "endorse[d] the holding in *White* that federal law creates a statutory employment relationship between interstate carriers and the drivers of the trucks leased to them[.]" *Id.* at 1501. But the Eleventh Circuit clarified that "whether that statutory employment relationship is sufficient to constitute an employer/employee relationship for the purposes of workers' compensation is a question of state law." *Id.* In dicta, however, the *Judy* court distinguished workers' compensation issues from liability to the general public, emphasizing the stronger federal interest in regulating the latter relationship. *See id.* at 1501. In doing so, the Court quoted a Fifth

12

Circuit decision stating that "the traditional common law doctrine of master-servant relationships and respondeat superior does not apply" in the context of public liability. *Id.* (*quoting Price*, 727 F.2d at 497).

The rebuttal presumption approach sits in a "Goldilocks" zone between *White* and *Judy*. Interstate carriers are not forced to assume an additional "burden of liability" without "the protection given [to] employers under state substantive law" because state-law is the final arbiter of the employment relationship. *White*, 599 F.2d at 53. And the heightened federal interest in public safety recognized by the Eleventh Circuit in *Judy* is protected by the presumption that establishes a baseline of liability. *See Judy*, 844 F.2d at 1501.

For these reasons, the court will apply the rebuttal presumption approach to Choi's claims against the Horizon Defendants. That means (a) the court presumes an employment relationship between the Horizon Defendants and Dyches but (b) the Horizon Defendants can overcome that presumption by pointing to Alabama common law.

B.    Employer Liability Under Alabama Law

Several factors are relevant in determining whether an individual is an employee or agent of another under Alabama law. *See Lathan Roof Am., Inc. v. Hairston*, 828 So. 2d 262, 265 (Ala. 2002). "Obviously, one of the most important factors is whether there is evidence of an offer of employment and acceptance of that offer. Another important factor is the degree of control the alleged employer retains over the alleged employee." *Id.* (citation modified). And while there must be a right of control by the principal over the agent, it is not essential that the right actually be exercised. *See National Sec. Fire & Cas. Co. v. Bowen*, 447 So.2d 133, 137 (Ala. 1983).

"Other factors are certainly relevant. For example, the exercise of— or the failure to exercise—prerogatives inherent in the alleged employee status give some indication as to whether a person actually holds (or believes that he or she holds) that status." *Hairston*, 828 So. 2d at 265-66.

13

Ultimately, "[a]gency is determined by the facts and not by how the parties may characterize their relationship." *Ex parte Hicks*, 537 So. 2d 486, 488 (Ala. 1988). And "[b]ecause working relationships take a wide variety of forms, each case must depend on its own facts, and all features of the relationship are considered together." *Jackson v. Allen*, 352 So. 3d 678, 685 (Ala. 2021).

Generally, whether an employment relationship exists is a question for the fact-finder or jury. *S. Ala. Skills Training Consortium v. Ford*, 997 So. 2d 309, 327 (Ala. Civ. App. 2008). In Alabama, "the rule is that if there is a scintilla of evidence to support plaintiff's case, that is, a mere gleam, glimmer, spark, the smallest trace, of evidence to support the plaintiff's theory," the jury must decide the employment question. *Cox v. Howard Hall Co.*, 265 So. 2d 580, 584 (1972). Likewise, the jury must resolve whether the alleged employer or principal exercised sufficient control to be held liable for the agent or independent contractor's conduct. *See Jackson*, 352 So. 3d at 685.

By the same token, whether an employee of one company has been transferred into employment of another company is a jury question. *Alabama Power Co. v. Smith*, 142 So.2d 228, 239 (1962). "Where the evidence does not clearly establish who the employer is, consideration must be given to the character of the service to be rendered, the duration of employment, and the one who is paying the employee." *Id.* "[A]ll competent, relevant, legal evidence tending to prove or disprove the issue should be considered" and "each case must be determined on its own facts." *Id.* But "[w]here there is evidence of a measure of control over an employee by two or more putative employers, a finding of 'control' and liability in just one of them would be obviously erroneous." *Ex parte Stewart*, 518 So. 2d 118, 120 (Ala. 1987).

C.    Application To These Facts

Horizon Mid Atlantic does not dispute that Dyches was driving under its motor carrier authority on the day of the accident (though it does dispute whether Dyches was an employee or agent subject to Horizon Mid

Atlantic's direction and control). (*See* docs. 89-2, p. 40; 95, p. 5). Horizon Freight, on the other hand, maintains that it did not employ Dyches at all. (*See* docs. 91, p. 5; 86-15, p. 107). During his deposition, Mark Doland, the Director of Safety at Horizon Mid Atlantic, explained that Horizon Freight and Horizon Mid Atlantic are separate companies, but they do share resources. (*See* doc. 86-15, p. 107). This sharing of resources extends to things like hiring applications, drug testing pools, and explains—at least according to Doland—why Horizon Freight's name was listed on many of Dyches' hiring documents despite him only being "leased on" with Horizon Mid Atlantic. (*See* doc. 86-15, pp. 107-108, 339-49).

The record also suggests that the Horizon companies shared personnel. Take Mr. Doland for example. Doland is employed as the Director of Safety for both Horizon Freight and Horizon Mid Atlantic. (*See* doc. 86-15, pp. 49-50). The companies are so closely intertwined that Doland does not even know which of the two companies writes his paycheck. (*See id.*) The two companies also share the same President, David Ferrante. (*See* docs. 86-15, pp. 72-73; 89-7). And Choi submits substantial evidence that Horizon Freight and Horizon Mid Atlantic may have also co-employed Dyches. For example:

> 24. Horizon Freight undertook and/or oversaw the hiring process of Mr. Dyches. (*See* Doc. 86-15, pp. 353-441)
>
> 25. On or around August 27, 2020, Dyches submitted a "Contractor Application" to drive for Horizon Freight System, Inc. (Doc. 86-15 [Ex. 5 to Doland Depo], pp. 353-357)
>
> 26. In his application to Horizon Freight, Dyches authorized "Horizon Freight System" to "investigate[] and inquire[] of my personal, work, financial driving and medical history and related matters as may be necessary in arriving at a [] decision." (Doc. 86-15 [Ex. 5 to Doland Depo], p. 357)
>
> 27. On August 27, 2020, Horizon Freight requested and received motor vehicle records for Dyches prior to Dyches

15

contracting with Horizon Mid-Atlantic. (Doc. 86-15 [Ex. 7 to Doland Depo], pp. 360-364; *see also id.*, p. 130:3-21)

28. On August 27, 2020, Horizon Freight requested and received a criminal background check on Dyches. (Doc. 86-15 [Ex. 9 to Doland Depo], pp. 367-370)

29. On September 2, 2020, Dyches signed a Horizon Freight "Corporate Commitment to Safety And Contractor Acknowledgement." (Doc. 86-15 [Ex. 6 to Doland Depo], p. 358-359; *see also id.*, pp. 115:11-117:20)

30. On September 2, 2020, Dyches signed a "Training Overview and Acknowledgement" as part of his retention with Horizon Freight. (Doc. 86-15, p. 377; *id.*, p. 158:2-16)

31. On September 2, 2020, Dyches signed acknowledgements to Horizon Freight that he received the safety manual and the FMCSA handbook. (Doc. 85-16 [Exs. 14 and 15 to Doland Depo], pp. 440-441; *id.*, pp. 171:8-22, 172:7-173:16)

***

43. The Lease and Service Agreement allowed Horizon Mid Atlantic, but not Mr. Dyches, to assign the Lease and Service Agreement to an "affiliated" motor carrier. (Doc. 86-15 [Ex. 4 to Doland Depo], p. 347, § 18)

***

47. Prior to and at the time of the subject accident giving rise to this action, Horizon Freight was the certificate holder for Dyches' insurance policies covering Dyches' vehicle. (Doc. 89-8)

48. "Annual Vehicle Inspection Reports" for Dyches' vehicle were submitted to Horizon Freight. (Doc. 89-9)

> 49. Similarly, monthly "Preventative Maintenance Reports" were submitted to Horizon Freight. (Doc. 89-10)
>
> 50. Horizon Freight maintained all inspection reports. (Docs. 89-9, pp. 1-4; Doc. 89-10, pp. 1-14; Doc. 86-15 [Ex. 13 to Doland Depo], p. 397)

(Doc. 91, pp. 12-17).

Again, Horizon Freight's only explanation for their involvement in Dyches' hiring process and continued oversight is that Horizon Freight and Horizon Mid Atlantic "share resources." (Doc. 86-15, p. 107). But that does not amount to an explanation for why Horizon Freight, rather than Mid Atlantic, seemingly undertook the obligations of Dyches' motor carrier under 49 U.S.C § 14102. Horizon Freight inspected Dyches' vehicle and maintained insurance on it as required by § 14102(a)(3). (*See* docs. 89-8; 89-9; 89-10; 86-15, p. 397). Horizon Freight ensured Dyches' compliance with federal regulations as required by § 14102(a)(4). (*See* doc. 86-15, p. 440). In short, there is a significant overlap between Horizon Freight and Mid Atlantic. And if the line between the companies is so thin that the Director of Safety can't be sure who his actual employer is, then the court can't be certain who Dyches' employer is either. At the very least, the record evidence does not provide a clear answer.

Viewing the evidence in the light most favorable to Choi, a reasonable factfinder could decide that Dyches was co-employed by Horizon Freight. Admittedly, the rebuttal presumption of employment under the federal regulations applies to Horizon Mid-Atlantic, not Horizon Freight, because Mid Atlantic leased Dyches' truck and Dyches was driving under its authority at the time of the accident. (*See* docs. 86-15, pp. 339-352; 89-2, p. 40). But under Eleventh Circuit precedent, more than one motor carrier can share ownership and control of leased vehicles such that they become jointly liable. *See Simmons*, 478 F.2d at 867. And Choi has provided far more than a "scintilla of evidence" to support his theory that the Horizon Defendants shared ownership and control of the vehicle leased from Dyches. *Cox*, 265 So. 2d at 584. Under Alabama law,

17

that is enough to send the employment question to the jury. *See Smith*, 142 So.2d at 239. So the court will **DENY** Horizon Freight's motion for summary judgment on Choi's negligence claim (Count I).

## II.    Negligent Entrustment

In Count III of his complaint, Choi asserts a negligent entrustment claim against the Horizon Defendants. (Doc. 1-1, pp. 15-16). Under Alabama law, "[t]he essential ingredients of a cause of action for negligent entrustment are: (1) an entrustment; (2) to an incompetent; (3) with knowledge that he is incompetent; (4) proximate cause; and (5) damages." *Halford v. Alamo Rent-A-Car, LLC*, 921 So. 2d 409, 412 (Ala. 2005) (*quoting Mason v. New*, 475 So. 2d 854, 856 (Ala. 1985)). The Horizon Defendants contend that Choi cannot establish that Dyches was incompetent, so they are entitled to summary judgment on Count III.[3] Applying the high bar that Alabama law sets for incompetence, Defendants are right.

In Alabama, "the incompetence of a driver is measured by the driver's demonstrated ability (or inability) to properly drive a vehicle," *Halford*, 921 So. 2d at 413–14 (Ala. 2005), and this may be measured by characteristics such as "general incompetence" or "habitual negligence." *Edwards v. Valentine*, 926 So. 2d 315, 322 (Ala. 2005). The law requires that a driver have a "demonstrated ability [] to properly drive a vehicle," *Halford*, 921 So.2d at 413–14; it does not require that he have a record completely free of mistake. *See, e.g., Pryor v. Brown & Root USA, Inc.*, 674 So. 2d 45, 52 (Ala. 1995) ("[Defendant]'s prior driving record—two speeding tickets and a suspended prosecution of a DUI charge over a 10-year period—is not sufficient to support a claim of negligent entrustment."); *Thompson v. Havard*, 285 Ala. 718, 722 (1970) ("[P]roof of two moving violations or accidents within a two year period prior to the accident ... is probably insufficient [to present the question of

---

[3] The Horizon Defendants also argue that Choi cannot establish the entrustment or knowledge elements of his negligent entrustment claim. Because the court finds that Choi cannot establish incompetence, it need not address those issues.

incompetency to a jury].'" (internal citations and quotations omitted)); *Askew v. R & L Transfer, Inc.*, 676 F. Supp. 2d 1298, 1303 (M.D. Ala. 2009) (finding that a driver's record of two moving violations and four minor accidents over an approximately nine-year period did not amount to incompetence); *Green v. Markovitch*, 385 F. Supp. 3d 1190, 1198 (N.D. Ala. 2019) (finding that a driver's record of two pre-employment traffic citations, one speeding violation, a jack-knife incident, and three non-moving violations did not amount to general incompetence); *Taylor v. Salem Carriers, Inc.*, No. 2:23-CV-0886-JHE, 2026 WL 852121, \*5 (N.D. Ala. Mar. 27, 2026) (finding that evidence of one accident, with no evidence in the record that the defendant was at fault, and one non-out-of-service violation was insufficient to establish incompetence); *Wallace v. Ebaugh*, No. 2:20-CV-02062-KOB, 2022 WL 17672619, \*5 (N.D. Ala. 2022) (finding that four speeding citations in six-year period was insufficient to create an issue of fact regarding incompetence).

Here, Choi's evidence of Dyches' incompetence can be organized into three buckets: (1) Dyches' driving history; (2) Dyches' criminal history; and (3) Dyches' inexperience driving tractor trailers. The court will address each in turn.

1. *Driving history*: Choi asserts that the Horizon Defendants performed motor vehicle record (MVR) searches on Dyches prior to his employment. Those MVR searches showed Dyches had at least the following: (1) conviction for "reckless driving" in September 2014; (2) conviction for "driving too fast for conditions" in June 2014; (3) conviction for "speeding 10-mph or less" in February 2015; and (4) "reportable" accidents in July 2021, November 2017, and May 2016. (Doc. 86-15, pp. 360-365, 371-376; *id.*, pp. 130-136).[4] The most relevant of these incidents is the July 2021 accident because it is only one that occurred within two years of the accident at issue in this case. *See Thompson*, 285 Ala. at 722.

---

[4] The July 2021 accident occurred after Dyches began working for Horizon, so that accident would not have appeared on the pre-employment MVR searches.

This is also the incident that Choi places the greatest emphasis on because it is factually the most similar to the accident with Choi.

The police report from the July 2021 accident shows that Dyches was involved in a collision while driving for Horizon Mid Atlantic with another tractor-trailer due to "an improper lane change" causing one truck to "strike" the other. No citations were issued "[d]ue to conflicting stories" of the two drivers "and no witnesses along with no physical evidence." (Docs. 86-7, pp. 58-59; 86-15, pp. 146 -147).

Favorable to Choi, the July 2021 accident took place only four months before Dyches collided with Choi, and (like this case) the accident stemmed from an improper lane change. But despite these similarities, the July 2021 accident *by itself* does not establish that Dyches was incompetent; particularly when Choi offers no evidence that Dyches caused the July 2021 accident. *See Thompson*, 285 Ala. at 722 ("[P]roof of only one previous traffic violation is grossly inadequate to establish incompetency or recklessness, and proof of two moving violations or accidents within a two year period prior to the accident made the basis of the suit, is probably insufficient[.]" (internal citation and quotation omitted)); *see also Taylor*, 2026 WL 852121, at *5 (finding that evidence of one accident, with no evidence in the record that the defendant was at fault, and one non-moving violation was insufficient to establish incompetence).

As for the other traffic violations and minor accidents listed on Dyches' MVR, they are too remote in time, and too few in number, to prove that Dyches was incompetent. Even competent drivers may sometimes be negligent. *See McGowin v. Howard*, 251 Ala. 204, 209 (1948). But competency, under Alabama law, does not require that Dyches have a driving record completely free of mistake. *See Pryor*, 674 So. 2d at 52. So this bucket of evidence isn't enough.

2. *Criminal history:* Choi combines Dyches' 2014 and 2015 speeding violations with Dyches' 2010 conviction for "Assault/Assault and Battery of a High and Aggravated Nature" to argue that Dyches' criminal history

made him an incompetent driver. (*See* doc. 91, pp. 15, 31; *see also* doc. 86-15, pp. 367-370; *id.*, 140-145). Again, Dyches' traffic violations that occurred six and seven years before this accident have, at best, questionable value in the competency analysis. An 11-year-old assault conviction has even less value because it provides no evidence of Dyches' competency as a driver. An assault conviction certainly would seem to have less relevance for a driver's competency than prior DUI convictions. And even then, other courts have found that prior DUI convictions are not dispositive. *See Jones v. Richardson*, No. 2:22-CV-00875-RDP, 2023 WL 8284375, *6 (N.D. Ala. Nov. 30, 2023) (finding that commercial truck driver was not incompetent despite two prior DUI charges and testing positive for marijuana twice during his career as a commercial driver). *C.f., Valentine*, 926 So. 2d at 323 (finding that three instances of driving under the influence of alcohol or a controlled substance—including the underlying accident—was one factor, among others, bearing on driver's competency). So the evidence of Dyches' criminal history is insufficient to raise a genuine issue of material fact as to his incompetency.

3. *Inexperience*: Choi's final bucket of evidence doesn't move the needle either. Choi suggests that Dyches was incompetent because he only had 18 months experience driving tractor trailers before Horizon hired him, whereas Horizon's internal policy requires two years of experience. (*See* docs. 91, p. 28; 86-2, pp. 27-28; 86-15, p. 354; 86-6, p. 90). While that may be true, the record demonstrates that Horizon complied with all federal and state regulatory requirements in hiring and qualifying Dyches. (*See* docs. 86-6, pp. 97-98, 140; 86-15, p. 149). That "Dyches held a valid CDL, met all FMCSA qualification standards, and had no disqualifying safety history" does not establish that Dyches was a *competent* driver. (Doc. 87, p. 12). But the fact that Dyches didn't have the two years of experience mandated by Horizon's internal policy does not make him *incompetent* either.[5]

---

[5] While Dyches may have only had 18 months experience driving tractor-trailers when he was hired by Horizon, Dyches did have experience driving other large trucks and equipment. Dyches began driving heaving equipment such as a "forty-foot goose neck

―――――

To sum up, viewing all of the evidence together in the light most favorable to Choi, the court finds that the evidence fails to support a finding that Dyches was incompetent. Compared to other Alabama cases, this case is more like the cases that found the evidence insufficient to create a genuine issue of material fact as to a driver's competency than it is to the cases that have sent the question to the jury. *Compare Green*, 385 F. Supp. at 1198; *Taylor*, 2026 WL 852121, at \*5; *Wallace*, 2022 WL 17672619, at \*5; *Jones*, 2023 WL 8284375, at \*6; *with, Vasser v. Tezi Express, LLC*, No. 4:19-cv-1823-CLM, 2022 WL 19625, at \*7 (N.D. Ala. Jan. 3, 2022) (finding a jury could infer incompetence from the driver receiving "a lot" of tickets; receiving a speeding ticket, citation for following too closely, and citation for a lane restriction violation within two years of the accident; receiving 28 traffic tickets while in his personal vehicle; having his driver's license suspended five times; and being involved in two accidents in his personal vehicle); *Hobbs v. U.S. Xpress, Inc.*, No. 7:18-CV-02129-LSC, 2021 WL 913398, at \*4 (N.D. Ala. Mar. 10, 2021) (finding a jury could infer incompetence from two DUI convictions, four accidents in the two years preceding the accident in the case, admitted "dependency" on Xanax and Tramadol, and health issues days before the accident). So the court will **GRANT** Defendants' motion for summary judgment on Choi's negligent entrustment claim (Count III).

---

with equipment on it and a thousand-gallon chemical tank," and a "hotshot, flatbed" as early as 2010, and drove such vehicles until he was hired by Horizon in 2020. (*See* docs. 86-2, pp. 26-28; doc. 86-7, p. 62).

## III.    Wantonness and Punitive Damages

Finally, the court turns to Count II, in which Choi pleads a claim of wantonness and recklessness that would result in compensatory and punitive damages.

Under Alabama law, "[p]unitive damages may not be awarded in any civil action … other than in a tort action where it is proven by clear and convincing evidence that the defendant consciously or deliberately engaged in … wantonness… with regard to the plaintiff." Ala. Code § 6-11-20(a). "[W]hen the law imposes the higher burden of proof of clear and convincing evidence as to a particular claim or factual issue, the nonmovant must present evidence at the summary-judgment stage that would qualify as clear and convincing evidence if accepted and believed by the fact-finder." *Ledbetter v. Ledbetter*, 323 So.3d 1210, 1213 (Ala. 2020) (*quoting Phillips v. Asplundh Tree Expert Co.*, 34 So.3d 1260, 1266 (Ala. Civ. App. 2007). "Substantial evidence in the context of a case in which the ultimate standard for a decision is clear and convincing evidence is evidence that a fact-finder reasonably could find to clearly and convincingly establish [the existence of] the fact sought to be proved. Thus, even if a trial judge reaches his or her own conclusion that the evidence presented does not clearly and convincingly establish [the subject fact], it is not for him or her to act upon that factual determination, but to determine instead whether the actual fact-finder could reasonably make a different finding based upon the same evidence." *Ex parte McInish*, 47 So. 3d 767, 776 (Ala. 2008) (citation modified).

So before the court can decide whether Choi can maintain his claim for punitive damages, the court must determine whether Choi has presented substantial evidence from which a jury could reasonably find that Dyches' conduct was wanton.

### A.    Wantonness and Recklessness

Under Alabama law, wantonness is "the conscious doing of some act or the omission of some duty while knowing of the existing conditions *and*

23

being conscious that, from doing or omitting to do an act, injury will likely or probably result." *Ex parte Essary*, 992 So. 2d 5, 9 (Ala. 2007) (*citing Bozeman v. Cent. Bank of the S.*, 646 So. 2d 601 (Ala. 1994)) (emphasis in original). Wantonness is not simply a more severe version of negligence, but is an entirely different tort concept. *See id.* While negligence is characterized as "the inadvertent omission of duty," wanton misconduct is characterized by the state of mind of consciously taking an action with knowledge that "the doing or not doing of [the act] will likely result in injury ...." *Id.* (*quoting Tolbert v. Tolbert*, 903 So. 2d 103, 114–15 (Ala. 2004)). "Wantonness is a question of fact for the jury, unless there is a total lack of evidence from which the jury could reasonably infer wantonness." *Cash v. Caldwell*, 603 So. 2d 1001, 1003 (Ala. 1992).

In Alabama, drivers are presumed to not engage in self-destructive behavior. *See Essary*, 992 So. 2d at 12. Implicit in this presumption is the requirement that the defendant's behavior creates a "risk of injury to [himself] ... as real as any risk of injury to the plaintiffs." *Id.* Thus, other courts have held that the *Essary* presumption against self-destructive behavior did not apply when a truck driver's actions caused smaller passenger vehicles to collide into the trailer portion of commercial vehicles. *See McCutchen v. Valley Home, Inc.*, 100 F. Supp. 3d 1235, 1240 (N.D. Ala. 2015); *Griffin v. Modular Transp. Co.*, No. 2:12–CV–2378–WMA, 2014 WL 896627, at *4 (N.D. Ala. March 6, 2014). However, there is no per se rule that the driver of a commercial vehicle can never enjoy the *Essary* presumption. *See Green*, 385 F. Supp. at 1195; *Craft v. Triumph Logistics, Inc.*, 107 F. Supp. 3d 1218, 1222 (M.D. Ala. 2015).

Based on the facts of this case, the court finds that the *Essary* presumption applies. This is not a case like *McCutchen* or *Griffin* where the defendant drivers' actions caused smaller passenger vehicles to collide into the trailer portion of his vehicle, and therefore there was no real risk of injury to those defendants. Dyches' actions allegedly caused another large tractor trailer to collide with his vehicle. The size of both Dyches and Choi's trucks meant that a collision could pose a substantial risk of harm

24

to both drivers, and in fact it did. So there is a rebuttable presumption that Dyches did not consciously engage in self-destructive behavior.

But the presumption doesn't end the inquiry. Choi can rebut the presumption that Dyches would not intentionally engaged in behavior that could injure himself by presenting evidence that Dyches' driving is so "inherently reckless" that it signals the kind of "depravity consistent with disregard of instincts of safety and self-preservation." *See Essary*, 992 So. 2d at 12. "That is, when a defendant's allegedly wanton conduct toward others would also endanger the defendant, the evidence must support finding that the defendant's wantonness extended to her own safety." *Tutor v. Sines*, 380 So. 3d 1035, 1039 (Ala. 2023). The Alabama Supreme Court "has held that while speed alone does not amount to wantonness, speed, coupled with other circumstances, may amount to wantonness." *Hicks v. Dunn*, 819 So. 2d 22, 24 (Ala. 2001). "Indeed, evidence of an unsafe lane change in a speeding case is an additional circumstance that can support a finding of wantonness." *State Farm Mut. Auto. Ins. Co. v. Wood*, 392 So. 3d 489, 498 (Ala. 2023) (*citing Hornady Truck Line, Inc. v. Meadows*, 847 So. 2d 908, 916 (Ala. 2002)).

Viewed in the light most favorable to Choi, there is sufficient evidence to overcome the *Essary* presumption and create a genuine dispute of material fact as to Dyches' wantonness. First, there is a genuine issue as to whether Dyches was driving at an unsafe speed. Curry, an eyewitness to the collision, testified that Dyches was speeding, driving as much as 90 mph in a 70-mph zone. (*See* docs. 86-5, pp. 22, 32) Dyches, however, claimed that he was only going 70 mph at the time of the collision. (*See* doc. 86-2, p. 67). So there is a genuine fact dispute.

Second, there is a genuine dispute whether Dyches was conducting an unsafe lane change. When Dyches activated his right turn signal, Choi's front bumper was in line with Dyches' own rear tire or "thereabouts." (*See* doc. 86-2, pp. 82, 84-85). Choi had been right of Dyches for two minutes before the collision. (*See* doc. 86-2, pp. 70-71). Dyches admitted that when he activated his right turn signal, he knew "[i]t was

25

too close for [him] to get over." (Doc. 86-2, p. 82). And despite seeing Choi next to him, Dyches changed lanes into Choi within "seconds." (Doc. 86-2, p. 82). That's another material dispute that, if resolved in Choi's favor, could establish that Dyches knew he was about to put himself and Choi in danger. *See Wood*, 392 So. 3d at 498; *Meadows*, 847 So. 2d at 916 (Ala. 2002).

Third, there is a genuine dispute whether an "Unknown Vehicle" contributed to Dyches' conduct in changing lanes. Defendants try to spin King and Curry's testimony to suggest that Choi was fighting over a lane with the unknown vehicle before the collision with Dyches. (*See* doc. 95, p. 17). But read in a light favorable to Choi (if not plainly), the witnesses testified that Choi and Dyches that were "tussling over a lane," not Choi and an unknown vehicle. (Doc. 86-4, p. 37). Curry testified that no vehicle attempted to pass Dyches on the left. (Doc. 86-5, pp. 23, 28-29). Curry and King both testified, respectively, that they never observed any non-party vehicle contribute to this collision nor cause Dyches to swerve. (*See* docs. 86-5, pp. 20-21, 23; 86-4, p. 19). They also testified that Choi was always operating his vehicle within his lane of travel and that they did not see Choi do anything that caused or contributed to the collision. (*See* docs. 86-4, pp. 27, 40-41; 86-5, pp. 20, 33).

Ultimately, the "pivotal question" is whether a factfinder could view the evidence as proving that Dyches "consciously and intentionally changed lanes in such a manner as to charge him with knowledge that his action would probably result in injury to" others. *Green v. Leatherwood*, 727 So.2d 92, 94 (Ala. Civ. App. 1998). Viewing all the evidence in the light most favorable to Choi, the answer is yes. If a jury believed the testimony from Choi, King, and Curry, the jury could reasonably conclude that Dyches acted wantonly by (1) intentionally violating the speed limit (2) while fighting over a lane with Choi, and (3) seeing that Choi's vehicle was too close to his own to get over, intentionally conducted an unsafe lane change (4) with knowledge that his actions constituted a risk of probable harm to himself and to Choi. Based on this evidence, the court concludes that a reasonable jury could find that Dyches' behavior was

26

"inherently reckless." *Hornady Truck* Line, 847 So. 2d at 915-16. At minimum, the evidence is sufficient to create a genuine issue of material fact. So the court will **DENY** Defendants' motion for summary judgment on Choi's wantonness claim.

### B.    Punitive Damages

Because the court finds that Choi might be able to prove by clear and convincing evidence that Dyches' conduct was wanton, the court also finds that there is a genuine issue of material fact whether Choi is entitled to punitive damages. So the court will also **DENY** Defendants' motion for summary judgment on Choi's claim for punitive damages.

### CONCLUSION

For the reasons explained within, the court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for summary judgment. (Doc. 85). The court **GRANTS** Defendants' motion on Choi's claim for negligent entrustment (Count III). And the court **DENIES** Defendants' motion to the extent that they seek summary judgment on Choi's claim for negligence against Horizon Freight (Count I), on Choi's claim for wantonness (Count II), and Choi's claim for punitive damages.

The court will enter a separate order that **RESETS** the schedule for trial on Choi's remaining claims.

**DONE** and **ORDERED** on June 23, 2026.

_____
**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE

27